

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MANDY NICOLE LATHROP,
                    Plaintiff,

        v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social Security,
                    Defendant.

_____

**DECISION & ORDER**
15-CV-6758

## Preliminary Statement

Plaintiff Mandy Nicole Lathrop ("plaintiff" or "Lathrop") brings this action pursuant to Title II and Title XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits.   See   Complaint (Docket # 1).   Presently before the Court are competing motions for judgment on the pleadings.   See Docket ## 9, 13.   For the reasons that follow, the plaintiff's motion (Docket # 9) is **granted**, and the defendant's motion (Docket # 13) is **denied**.

## Background and Procedural History

Plaintiff applied for disability benefits on July 16, 2012, alleging a disability beginning November 15, 2012 of depression, anxiety, Crohn's disease, scoliosis, PTSD, and back pain.   AR at

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017.   Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for former Acting Commissioner Carolyn W. Colvin as defendant in this lawsuit.

1

174.   These claims were initially denied on November 23, 2012.
AR at 90-103.  Plaintiff timely filed a request for a hearing.
AR at 12.   Plaintiff, represented by counsel, testified at the
hearing before Administrative Law Judge Brian Kane (the "ALJ")
on July 11, 2014.  Vocational Expert Peter Manzi (the "VE") also
testified.  AR at 48-84.

The ALJ issued an unfavorable decision on August 25, 2014.
AR at 16-38.  Plaintiff exhausted her administrative remedies by
requesting review by the Appeals Council, which review was
denied on October 22, 2015.  AR at 1.  She then filed this civil
action on December 21, 2015.  Docket # 1.  The parties made
competing motions for judgment on the pleadings (see Docket ##
9, 13), and I heard oral argument on January 18, 2017 (see
Docket # 18).

## Medical History

Plaintiff's  health  has  been  mired  by  substance  abuse,
mental impairments, back pain, and abdominal pain.  Most of the
medical  evidence  pertains  to  her  mental  impairments  and
substance abuse.  Because reports of her back and abdominal pain
are often found together with mental health reports, I address
all medical evidence chronologically below.

In  a  questionnaire,  plaintiff  reported  that  she  cooks,
cleans, and takes her children to school.  AR at 216, 221. She
stated that she has trouble sleeping and can no longer stand for

2

long periods of time.   AR at 216.   Plaintiff reported not being able to go out because of anxiety attacks and fear of people. AR at 218.   She has a driver's license but does not go out alone or often.   AR at 218.   Plaintiff does not spend time with others.   She reported not having any problems following instructions or paying attention.   AR at 222.

Plaintiff indicated that she first experienced pain stomach and back pain five years ago.   AR at 223.   Her anxiety began about ten years ago, and is brought on by stress, crowds, memories, or specific events.   AR at 225.   During these attacks, which occurred daily, plaintiff's heart beats fast, and she sweats and shakes.   AR at 225.

On August 16, 2010, plaintiff reported to English Road Psychotherapy Practice, complaining of stress, anxiety, and depression.   AR at 290.   She reported that her biological father was in jail for murder, that her step father raised her, and that she has a history of being sexually and physically abused. AR at 290-91.   She also reported using marijuana, nicotine, and occasionally using alcohol, but never using cocaine.   AR at 291. Plaintiff reported only sleeping a few hours per night.   AR at 291.   Therapist Gail Peterson, LCSW,[2] diagnosed plaintiff with depressive disorder.   AR at 293.

---

[2] Therapist Peterson's handwritten notes are difficult to read.

Plaintiff returned to Therapist Peterson with reports that her "anxiety is bad." AR at 294. She was oriented times three, but was depressed, and reported sleep problems. AR at 294. She also noted that Xanax was making her sleepy, and that she had a diminished appetite and weight loss. AR at 294.

On October 4, 2010, plaintiff again presented to Therapist Peterson as oriented times three, but depressed and in pain. AR at 295. Later that month, on October 26, 2010, plaintiff was oriented times three and felt "up/down." AR at 295. She had a flattened affect. AR at 296. The following month, on November 9, 2010, plaintiff told Therapist Peterson that she had "kind of walked out of [her] job" due to statements made by her boss. AR at 296. Plaintiff was oriented times three but anxious and focused on her problems. AR at 296. Therapist Peterson filled out a Psychological Assessment for Determination of Employability that same day. Therapist Peterson noted that plaintiff was anxious and depressed. AR at 373. She opined that plaintiff was moderately impaired (unable to function 10-25% of the time) in his capacity to follow instructions, perform simple tasks, maintain attention, attend to a routine, and perform low stress, simple tasks. AR at 373. Therapist Peterson concluded that plaintiff could work for 20 hours per week with accommodations such as a pre-planned schedule and ability to avoid crowds. AR at 374. Therapist Peterson

4

expected these limitations to be necessary for three months. AR at 374. Plaintiff reported to the emergency department at Unity Health System on December 27, 2010 with sharp, intermittent abdominal pain, which was not consistent with her typical Crohn's pain. AR at 283.

Plaintiff returned to Therapist Peterson on February 9, 2011, where she was oriented times three, but depressed and focused on her problems. She explained she had a lot going on, including being six months pregnant and having increased anxiety due to lack of sleep and appetite. AR at 297.

On July 15, 2011, plaintiff presented to Sandra Boehlert, M.D., at the Monroe County Department of Social Services for a Physical Assessment for Determination of Employability. Plaintiff reported anxiety, depression, PTSD, Crohn's disease, and blackouts, although she was then pregnant and had not had a blackout in a year. AR at 376. Dr. Boehlert found that plaintiff had moderate to marked scoliosis, as well as Crohn's disease, and a "[p]sychology disorder." AR at 377. She opined that plaintiff had moderate limitations (2-4 hours) in walking, standing, pushing, and climbing the stairs. AR at 378-79. Dr. Boehlert concluded that plaintiff could work for up to 40 hours, with limitations such as avoiding heavy lifting (due to pregnancy or scoliosis), and frequent breaks for diarrheal

episodes.  AR at 379.  She expected these limitations to last four months.  AR at 378.

Again, while pregnant, plaintiff underwent an Assessment for Determination of Employability, this time by Jennifer Mariani, RPA-C.  Physician Assitant Miriani similarly estimated plaintiff's limitations, but opined that she could work for up to 40 hours per week.  AR at 385.

On May 16, 2012, plaintiff self-reported to Genesee Mental Health Center for a pre-admission screen.  AR at 311.  She reported PTSD, recurrent major depression, and anxiety disorder, with flashbacks and nightmares of past abuse (including being beaten up and raped).  AR at 311.  Plaintiff reported feeling isolated and tearful, and having difficulty leaving the house due to decreased energy.  AR at 311.  She reported excessive worry and panic, especially in social situations.  AR at 311. Plaintiff also indicated that she consumes two two-liter bottles of Mountain Dew daily.  The examiner noted that this consumption probably contributed to her anxiety.  She presented with slowed speech and decreased motor activity.  AR at 312.  Although her thought process was organized, plaintiff reported occasional racing thoughts.  AR at 312.  Her affect was flat and she exhibited depression and anxiety, although her memory was intact. Plaintiff reported a suicide attempt when she was 15. AR at 311.  Charlene Reeves, LMHC diagnosed plaintiff with PTSD,

major depression, anxiety, and a GAF of 48. AR at 311-13. Her Crohn's disease was also referenced in this report. AR at 312.

Several days later, on May 23, 2012, plaintiff saw Lynn McDonald at Genesee Mental Health Center. Plaintiff appeared to be restless, agitated, depressed, and anxious, with a flat affect, but oriented times three, with fair eye contact and intact memory. AR at 314. Plaintiff again presented on June 13, 2012, with slowed speech, a flat affect, and an otherwise depressed and anxious mood. AR at 316.

At that evaluation, Therapist Reeves completed a Psychological Assessment for Determination of Employability. Therapist Reeves opined that plaintiff would be very limited (unable to perform 25% of time) in capacity to perform simple and complex tasks independently, maintain attention, stick to a routine, and perform low stress simple tasks. AR at 390. Therapist Reeves determined that plaintiff would not be able to participate in any activities except for treatment or rehabilitation for one to three months. AR at 390.

Plaintiff presented many of the same conditions to Ms. McDonald on June 20, 2012. This time, however, Ms. McDonald noted that plaintiff seemed extremely anxious due to finding out that her stepfather was terminally ill and that her friend's daughter was reported missing. AR at 317. A week later, on June 27, 2012, plaintiff presented to Ms. McDonald trembling,

7

shaking, crying, and hyperventilating.    AR at 318.    It took
plaintiff ten minutes to calm down.    AR at 318.    She reported
feeling more stressed now that her children were home for the
summer.    AR at 318.    Her speech and thought-process continued to
be slow, and she presented as restless, depressed, and anxious,
though her memory was intact.    AR at 318.

On July 13, 2012, plaintiff was seen by Dorota Gardy, M.D.,
for a psychiatric evaluation.    At this visit, she appeared
distressed, anxious, restless, and became easily tearful.    AR at
323.    Dr. Gardy found plaintiff's affect to be congruent, her
attention adequate, and that she was oriented times three.    AR
at 323.    However, she struggled with chronological sequencing.
AR at 323.    She assigned plaintiff a GAF score of 55.    AR at
323.    Dr. Gardy recommended that plaintiff talk to her primary
care physician, especially for her Crohn's disease.    Dr. Gardy
reinstated plaintiff's Klonopin prescription.    AR at 323.
Plaintiff denied using illicit substances, but Dr. Gardy ordered
a urine screen.    AR at 323.

On July 30, 2012, plaintiff returned to Ms. McDonald with
panic attacks, anxiety, and depressed mood.    During that
session, plaintiff reported a decreased intensity and frequency
of panic attacks in the last two weeks, during which plaintiff
leaves the room and goes outside for a few minutes.    AR at 327.

Ms. McDonald noted that plaintiff appeared calmer than usual, but that she was depressed and had a flat affect.

Plaintiff saw Monika Quistorf, R.N., on August 9, 2012, where she appeared to be anxious and depressed, and reported having a hard time leaving her house. AR at 328. Plaintiff returned to Ms. McDonald on August 22, 2012, where plaintiff reported continued anxiety and depression, and increased panic attacks due to a Child Protective Services investigation. AR at 329.

On September 10, 2012, plaintiff's physician Jose E. Lopez, M.D., indicated that plaintiff suffered from chronic back pain and scoliosis, and that she was seeing a specialist about possible Crohn's disease. AR at 412. He noted that plaintiff was not to work until she had seen the specialist. AR at 412. Therapist Annette Lee wrote similar letters in October and November asking that plaintiff be excused from tenant accountability class due to her depression, anxiety, and inability to leave the house. AR at 417.

On September 12, 2012, plaintiff again saw Ms. McDonald with panic disorder and anxiety. On September 20, 2012, plaintiff returned to Ms. McDonald with continued anxiety and difficulty managing stress. AR at 438. Ms. McDonald noted that plaintiff was able to secure an appointment for her Crohn's disease. AR at 438. The following week, on September 27, 2012,

9

plaintiff came to Ms. McDonald with decreasing levels of anxiety and desensitivity to stressful situations. AR at 440. Plaintiff noted that she had gone to a store but left after 15 minutes due to the stress; the therapist challenged plaintiff to view this as a positive step. AR at 440. The mental status exam revealed anxiety, agitation, and restlessness. AR at 440. On October 4, 2012, plaintiff appeared to her session with Ms. McDonald with anxiety, panic, sweating, and shaking. Her mental status exam was largely the same. AR at 441.

Plaintiff began to see a new therapist, Annette Lee, on October 12, 2012. During that session, plaintiff reported that her anxiety had been higher over the previous week because her children were demanding her attention. The mental status exam revealed the typical agitation, restlessness, anxiety, and depression. AR at 443.

Christine Ransom, Ph.D. performed a psychiatric evaluation on plaintiff on October 17, 2012. Plaintiff told Dr. Ransom that she had been raped as a child, and her mother was repeatedly hospitalized for psychiatric issues, leaving plaintiff to feel emotionally abandoned. AR at 333. Plaintiff reported irritability, fatigue, wandering thoughts, and difficulty concentrating, as well as a lack of energy and willpower. AR at 333. She reported being afraid of leaving the house, blacking out, and being around people. During the

10

examination, plaintiff also reported a history of alcohol and marijuana dependence, but asserted that she stopped using alcohol two years ago and marijuana in 1999. AR at 333. Dr. Ransom noted that plaintiff appeared lethargic, but her thought process was coherent and she was oriented times three. AR at 334. However, Dr. Ransom indicated that plaintiff's attention and concentration were mildly impaired by emotional disturbance and anxiety. Her immediate memory was mildly impaired. AR at 334. Dr. Ransom opined that plaintiff could understand and follow simple directions and instructions and perform simple tasks independently. AR at 335. She could maintain attention and concertation for these tasks, maintain a regular schedule, and learn simple, new tasks. However, she would have moderate difficulty performing complex tasks, relating to others, and appropriately dealing with stress. Dr. Ransom diagnosed her with PTSD, major depressive disorder, panic disorder, and alcohol and marijuana dependence. AR at 335. She also referenced plaintiff's scoliosis and Crohn's disease. AR at 335. Dr. Ransom listed plaintiff's prognosis as fair.

That same day, plaintiff saw Karl Eurenius, M.D., for an internal medical examination. Plaintiff complained of Crohn's disease, mental health issues, mild scoliosis, and blackouts. AR at 337. Dr. Eurenius noted that plaintiff had been diagnosed with Crohn's disease five years ago after having intermittent

11

abdominal pain and multiple tests.    AR at 337.    However, plaintiff admitted that she had not had a colonoscopy or biopsy since her diagnosis.    AR at 337.    Without her Prednisone, plaintiff reported having chronic diarrhea.    AR at 337. Plaintiff also reported having scoliosis, which she said is a stabbing, low back pain, and blackouts almost weekly.    AR at 337.    Plaintiff had not had an MRI for the scoliosis and she had no neuropathic symptoms.    AR at 337.    Dr. Eurenius indicated that he could "not appreciate scoliosis."    AR at 339.    She denied use of alcohol or drugs, but acknowledged smoking a pack of cigarettes a day.    AR at 338.

Dr. Eurenius diagnosed plaintiff with probable Crohn's disease, but noted that she lacked a biopsy diagnosis.    He also stated that plaintiff had chronic back pain and blackout spells, both with uncertain etiology.    AR at 340.    Dr. Eurenius found that it was difficult to recommend limitations without a firm diagnosis, but opined that plaintiff would be markedly limited in activities where a blackout spell would injure herself or others.    AR at 340.    He also opined that plaintiff would be moderately limited in bending, lifting, carrying, and kneeling due to chronic low back pain.    AR at 340.

Plaintiff reported to Alyce Marks, R.N. for medication management on October 17, 2012, where plaintiff appeared depressed and anxious, and had negative ruminations.    AR at 444.

12

On November 8, 2012, plaintiff saw Therapist Lee with continued reports of anxiety, depression, and blackouts. Her affect was appropriate. AR at 448. She felt largely the same on November 27, 2012. There, plaintiff reported to Therapist Lee that she felt she could not leave the house to do the Christmas shopping. AR at 449. No mental status exam was performed.

Plaintiff came to Dr. Gardy on December 6, 2012, with reports that she was not eating or drinking. Dr. Gardy advised plaintiff to slowly increase intake. AR at 447. On December 11, 2012, plaintiff reported to therapy feeling sad that she was not able to take her son to see Santa due to her anxiety. AR at 450. On January 10, 2013, plaintiff reported to Therapist Lee that her depression has worsened to the point where plaintiff feels physically sick. AR at 459.

She saw Therapist Lee on February 6, 2013, with feelings of increased depression. She noted having two recent blackouts. AR at 462. Plaintiff saw Dr. Gardy again on February 7, 2013, where he noted that plaintiff looked better than she did before. AR at 460. He discussed her usual feelings of anxiety and depression and assigned her a GAF of 55. AR at 460. On February 11, 2013, plaintiff reported to Therapist Lee that she felt as though her depression and anxiety were out of control. AR at 463. She again had racing thoughts and negative ruminations. AR at 463.

13

On March 15, 2013, plaintiff reported to Therapist Lee with increased feelings of anxiety, low mood, and anger.  AR at 464. She was tearful, restless, anxious, and depressed.  AR at 464. Plaintiff appeared essentially the same on March 27, 2013.  She noted that a friend had bought her a ticket for a concert but she was scared to attend.  AR at 465.  Plaintiff's status was largely the same on April 12, 2013.  AR at 467.  On April 29, 2013, plaintiff reported her anxiety and depression were getting worse, brought on by a recent health scare with her toddler. Therapist Lee observed plaintiff's leg shaking.  AR at 467.

Plaintiff again underwent a Psychological Assessment for Determination of Employability on May 3, 2013.  Therapist Lee found that plaintiff had anxiety, panic attacks, and depression. AR at 418.  She opined that plaintiff was very limited (unable to function 25% or more of the time) in capacity to perform simple and complex tasks independently, maintain attention, maintain a routine, and perform low stress, simple tasks.  AR at 419.  Therapist Lee concluded that plaintiff was unable to participate in activities except for treatment for six months. AR at 419.

Dr. Gardy performed a Psychiatric Medication Review on May 24, 2013.  Plaintiff indicated that she did not think her medication was working.  Dr. Gardy introduced Lamictal as a mood stabilizer.  AR at 468.  Plaintiff met with Therapist Lee on

14

June 21, 2013, where she reported an increase in depression, irritability, and anxiety. Her leg was shaking. AR at 471. Plaintiff continued to be depressed, anxious, and angry at her June 27, 2013 meeting. She also reported drinking two beers since her last session. AR at 472. She was again depressed and anxious upon seeing Therapist Lee on July 5, 2013. AR at 473.

Plaintiff reported to Therapist Lee on July 31, 2013, that she had a low mood, anger, hopelessness, and a recent blackout episode, resulting in her falling. AR at 475. She saw Ivanna Colangelo, M.S., M.P.T., on August 27, 2013, again saying that she continued to have high levels of anxiety and depression. AR at 477. Plaintiff's depression and anxiety continued at the September 10, 2013 meeting, where plaintiff indicated to Therapist Colangelo that a childhood friend had recently been murdered. AR at 478. Therapist Colangelo's reports through the rest of September and into October are consistent with these feelings. AR at 478-482.

She had another Psychological Assessment on September 23, 2013, this time with Therapist Colangelo. Therapist Colangelo opined that plaintiff was very limited (unable to function 25% or more of the time) in capacity to perform simple and complex tasks independently, ability to maintain attention, and ability to maintain a routine. AR at 425. But she found plaintiff had moderate limitation in capacity to perform low stress, simple

15

tasks.  AR at 425.  She concluded that plaintiff could not participate in any activity aside from treatment for three months.  AR at 425.  At a Psychiatric Medication Review on October 25, 2013, Dr. Gardy assigned plaintiff a GAF of 50.  AR at 482.

Plaintiff reported worsened anxiety and depression on November 20, 2013, due to a recent arrest for having cocaine on her property.  AR at 484.  On December 5, 2013, plaintiff expressed a desire to Therapist Colangelo to obtain employment. AR at 486.  Her mental status exam was largely unchanged.

Plaintiff self-reported to Unity Chemical Dependency Outpatient on December 19, 2013.  She relayed her mental health history to the attending physician.  She denied use of cocaine, but admitted using marijuana, which she said she last used on December 6, 2013.  AR at 507.  Plaintiff also denied that her use of marijuana impacted her ability to work.  AR at 509.

By January 9, 2014, plaintiff reported decreased anxiety, but still low mood and energy.  AR at 486.  She denied substance abuse.  AR at 486.  Plaintiff tested negative for illicit substances in a urinalysis on January 17, 2014.  AR at 488-90. Her GAF was 55.

Yet again, plaintiff was evaluated by Therapist Colangelo on January 23, 2014, who noted some improvement.  She opined that plaintiff was moderately limited in capacity to perform

16

simple and complex tasks, and ability to maintain attention, follow a routine, and perform low stress tasks. AR at 429. She concluded that plaintiff could work for up to 5 hours per week in an environment with a limited number of people.  AR at 429. These limitations could be expected to last three months.  AR at 430.

On March 18, 2014, plaintiff again appeared depressed.  AR at 514.  She identified an interest in working on her coping skills and recounted a history of relationship issues.  AR at 510-14.  On April 21, 2014, plaintiff continued to report stressors regarding her relationships, but reported some positive progress.  AR at 516. Plaintiff continued to report depression and anxiety at her meeting with Therapist Colangelo on April 25, 2014 and May 6, 2014.  AR at 491-95.  By May 6, 2014, plaintiff had relapsed and admitted to cannabis use to due stressors at home.  AR at 518.

Nearly a month later, on June 3, 2014, plaintiff reported feeling somewhat more hopeful.  AR at 520.  She discussed returning to work for 5-10 hours per week delivering pizzas.[3]  AR at 520.  Her mood was euthymic.  AR at 521.  On June 3, 2014, plaintiff presented to Gastroenterology Associates of Rochester, complaining of symptoms related to Crohn's disease.  AR at 356.

---

[3] The report indicates that plaintiff "returned to working 5-10 hours per week."  AR at 520.  Plaintiff's hearing testimony contradicts this report. According to plaintiff's testimony, she was considering part-time employment, but never actually worked.  AR at 60.

17

It is not clear if any tests were done at this point. However, Andrej Strapko, M.D. commented that while a CT scan in 2007 suggested possible Crohn's disease, a colonoscopy in the last 1-2 years was "apparently negative." AR at 499. The doctor suggested plaintiff undergo another scan.

But again, on June 23, 2014, plaintiff reported to Unity Chemical Dependence with decreased mood and depression, this time, allegedly exacerbated by her inability to find affordable housing. AR at 523. Her mood and affect were depressed. AR at 524.

On June 30, 2014, Lindsay Lupo, LMSW at Unity Chemical Dependence, noted in a letter to plaintiff's attorney that plaintiff had seen some successes in her programs and that she had a clean date of May 1, 2014. AR at 526.

### Hearing Testimony

Plaintiff, her attorney Justin Goldstein, and vocational expert Dr. Manzi appeared before ALJ on July 11, 2014 for a hearing.

Testimony of Plaintiff: Plaintiff testified that she was 30 years old at the time of the hearing. She graduated from high school in 2004 and then received an associate's degree in paralegal work from Everest Institute. AR at 53. Plaintiff testified that she last worked in November 2010 at a pizza and

sub shop for about 15 hours per week. AR at 54. Prior to that, plaintiff worked as a cleaner. AR at 55. She was also a supervisor at a dry cleaner. AR at 57. Plaintiff testified that her therapist "pulled [her] out of work" due to her depression and anxiety. AR at 58. She further reported that, although she had recently considered applying for a job at a pizza delivery place, she never actually worked. AR at 60.

Plaintiff testified that she sees a chemical dependency therapist every Thursday as a consequence for her arrest for cocaine possession with intent to distribute. AR at 61. According to plaintiff, her boyfriend at the time was selling cocaine out of her house but she claims she was not actually selling the cocaine. AR at 62. Although plaintiff previously told Drug Court that she was using cocaine and marijuana, plaintiff testified at the hearing that she never used cocaine. AR at 63-64. However, she did use marijuana as it "was one of the only things that ever really helped [her] to be happy." AR at 64.

According to plaintiff, she has suffered from depression since she was 14. AR at 72. She estimated having blackouts weekly to bikweekly that were brought on by stress and anxiety. AR at 78. She reported taking Venlafaxine, Lamictal, Klonopins, and Trazodone. AR at 72. Although these medications helped, plaintiff did not believe any medication will "completely work."

AR at 72. Plaintiff has night terrors, so she takes the sleeping medication Trazodone, but then she sleeps too much and is not around for her three children who live with her. AR at 73. Plaintiff was also on Dicyclomine for Crohn's.[4] AR at 74. She reports having diarrhea accidents. AR at 75. According to plaintiff, she has been treated for Crohn's since June of 2014.

Plaintiff attends parenting classes, regular group therapy, and previously attended anger management classes. AR at 70-71. These classes take up her Mondays, Tuesdays, and Thursdays. She also has physical therapy. AR at 71. Plaintiff also does housework, including dishes and laundry, however, her 12-year-old daughter frequently helps. AR at 77. Her father helps her do the grocery shopping since plaintiff cannot be around many people and may black out. AR at 77. The father of plaintiff's youngest child helps with childcare.

Occasionally, plaintiff has bursts of energy that may last for two days and result in little sleep. AR. at 80. But the plaintiff will also have bad days where she will not eat and all she wants to do is sleep. AR at 80. Plaintiff reported that her therapist wanted her to go to a day-long program, but plaintiff could not participate because she had court and probation. AR at 80. Plaintiff will remain in her rehab program until she has been clean for a year. AR at 80.

---

[4] The parties dispute whether plaintiff was every diagnosed with Crohn's disease.

20

Since stopping marijuana use, plaintiff believes her depression and anxiety have improved "[k]ind of and not." AR at 82. Although she recognized it was not good, marijuana made plaintiff feel happier. AR at 82.

Testimony of the Vocational Expert: The VE classified plaintiff's past work as follows: (1) cleaner/housekeeper, Dictionary of Terms ("DOT") number 323.687-014, with a Specific Vocational Preparation ("SVP") of 2, which qualifies as light, unskilled work; (2) cook, fast food, DOT number 313.374-010, SVP of 2, light and skilled[5]; (3) presser, hand, DOT number 363.634-018, SVP of 2, light and unskilled; (4) supervisor, janitorial services, DOT number 381.137-010, SVP of 6, medium and skilled; (5) daycare worker, DOT number 359.677-018, SVP of 3, light and semi-skilled. AR at 67-68.

For the first hypothetical, the ALJ asked the VE to assume an individual who can lift and carry up to 50 pounds, can sit, stand, and walk for six hours each, and can occasionally deal with coworkers and the general public. AR at 58. The VE testified that plaintiff could perform past work as a presser or cleaner. AR at 68. The ALJ next asked the VE to assume that the individual would be off task 20 percent of the day. AR at 68. The VE testified that plaintiff could not perform any past

---

[5] The VE may have intended to say "unskilled."

work.  AR at 68.  He further testified that plaintiff could miss
up to two days from work per month.  AR at 69.

## Determining Disability Under the Social Security Act

The Evaluation Process:  The Social Security Act provides
that a claimant will be deemed to be disabled "if [s]he is
unable to engage in any substantial gainful activity by reason
of any medically determinable physical or mental impairment
which . . . has lasted or can be expected to last for a
continuous period of not less than twelve months."  42 U.S.C. §
1382c(a)(3)(A).  The impairments must be "of such severity that
he is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step
sequential evaluation process:

> 1.  The Commissioner considers whether the
> claimant is currently engaged in substantial
> gainful activity.
>
> 2.  If not, the Commissioner considers
> whether the claimant has a "severe
> impairment" which limits his or her mental
> or physical ability to do basic work
> activities.
>
> 3.  If the claimant has a "severe
> impairment," the Commissioner must ask
> whether, based solely on medical evidence,
> claimant has an impairment listed in

22

> Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving his case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2). When evaluating the severity of mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F. 3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must

determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265—66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision:  At the first step, the ALJ found that plaintiff has not engaged in substantial gainful activity since November 15, 2010, the alleged onset date.  AR at 22.  The ALJ then found at the second step that plaintiff had the following severe impairments: bipolar disorder, alcohol and marijuana dependence, and scoliosis.  AR at 22.  Although plaintiff alleged disability due to Crohn's disease, the ALJ found that plaintiff had not actually been diagnosed with such condition. AR at 22.  He noted that while many medical professionals refer to plaintiff's Crohn's disease, these reports appear to be based on plaintiff's assumption that she had such a condition, not any actual medical diagnosis.  AR at 22.  Because a medically determinable impairment must be established by medical evidence, rather than just symptoms, the ALJ concluded that plaintiff's reported Crohn's disease could not be a medically determinable impairment.  AR at 22.

At the third step, the ALJ determined that plaintiff's impairments or a combination of those impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. §§ 404.1520(d) and 416.920(d).

Considering plaintiff's impairments, as well as her substance abuse disorders, the ALJ found at the fourth step that she would have the residual functional capacity ("RFC") to perform light work, occasionally deal with co-workers and the

25

general public, and would be off-task for twenty percent of the
workday. AR at 25. In reaching this conclusion, the ALJ
evaluated the medical evidence. He assigned some weight to Dr.
Eurenius's consultative opinion that plaintiff would be mildly
to moderately limited in bending, lifting, carrying, and
kneeling because this opinion was consistent with findings on
examination and because Dr. Eurenius stated it would be
difficult to make any recommendations without a firm diagnosis.
AR at 26. The ALJ also accorded "little weight" to Dr.
Eurenius's claim that plaintiff would have marked limitations
for activities where a blackout spell would cause injury because
such a conclusion was vague and based solely on plaintiff's
allegations, without any evidence of blackouts. AR at 26.

The ALJ also assigned "some weight" to the reports from
Sandra Boehlert, M.D., and Jennifer Mariani that plaintiff could
work forty hours a week with some limitations since those
findings were consistent with plaintiff's functional
restrictions and medical reports but were intended to only apply
for a brief period of time during which plaintiff was pregnant.
AR at 27.

The ALJ assigned "little weight" to reports from September
of 2010 in which Dr. Lopez opined that plaintiff could work for
about 15 hours per week. The ALJ found that these limitations

explicitly applied only to a brief period of time, and are thus not more generally applicable. AR at 27.

The ALJ assigned "[s]ome weight" to the opinion from Therapist Peterson that plaintiff was moderately limited in following simple instructions, performing simple and complex tasks independently, maintaining attention and concertation for rote tasks, maintaining a schedule, and performing simple and low stress tasks. AR at 28. Therapist Peterson concluded that plaintiff was limited to working for up to twenty hours per week for a period of three months. The ALJ assigned only some weight to this opinion because, while consistent with multiple other reports in the record, it was based on treatment for a period of months, not years, and it specifically stated that the restrictions were to apply for only three months. AR at 28.

Some weight was also given to the assessment of Therapist Reeves, who, on July 10, 2012, found that plaintiff was very limited in her functional abilities. AR at 28. The ALJ found that this record was consistent with other records, but it was not based on an extensive treatment history between plaintiff and Therapist Reeves. AR at 29.

Likewise, the ALJ afforded Dr. Ransom's consultative psychological examination "some weight." AR at 29. Dr. Ransom opined that plaintiff could follow and understand simple tasks independently, maintain attention and concentration for simple

27

tasks, maintain a simple regular schedule, and learn simple new tasks.     She also opined that plaintiff would have moderate difficulty performing complex tasks, relating adequately to others, and dealing with stress.    AR at 29.    The ALJ assigned some weight to this report because Dr. Ransom indicated that plaintiff stopped using marijuana in 1999, even though the record is clear that she was using substances in 2013.    AR at 29.

The ALJ assigned "some weight" to Ms. Lee's opinion that plaintiff was very limited in her functional abilities and that plaintiff would be unable to participate in any activities except for rehabilitation for six months.    AR at 29.    Although the ALJ believed that this opinion was based on a treating relationship with plaintiff and that the opinion was consistent with the other medical records, it was to only apply for a six month period.    AR at 29.

The ALJ also reviewed assessments performed by Therapist Colangelo.    In an earlier assessment, Therapist Colangelo opined that plaintiff was very limited in most functional areas and was moderately limited in her capacity to perform low-stress, simple tasks.    AR at 30.    However, in a later report, Therapist Colangelo reported significant improvement in plaintiff's functioning, but still found her to have moderate limitations (unable to function ten to twenty-five percent of the time).    AR

28

at 30.    The ALJ assigned this opinion "some weight" because,
while supported by notes, mental status evaluations, and a
treating relationship, the later positive assessment may be
attributed to a decrease in substance abuse.    AR at 30.

At the fifth step, the ALJ concluded that plaintiff did not
have any past relevant work, and that there were no jobs that
existed in significant numbers in the national economy that the
plaintiff could perform.    AR at 31.    The plaintiff was therefore
disabled under the above-referenced framework.

The ALJ went on to evaluate how the above analysis would
change if plaintiff stopped her substance abuse.    He found that
plaintiff's bipolar disorder and scoliosis would continue, and
therefore she would continue to have severe impairments.    AR at
32.    Those impairments would still not meet or exceed a listed
impairment.    AR at 32.    And, the ALJ determined that if the
plaintiff stopped the substance abuse, she would have an RFC to
perform light work and would be limited to occasionally dealing
with coworkers and the general public.    AR at 34.    The ALJ found
she would not, however, be off task 20 percent of the time.

In so concluding, the ALJ pointed to Therapist Lupo's
report from June 30, 2014, which confirmed that plaintiff had
relapsed but had not been using substances since May 1, 2014.
AR at 36.    In these records, Therapist Lupo indicated that
plaintiff would be able to work a job five to ten hours per

29

week.    The ALJ afforded "significant weight" to this opinion because of the treatment relationship.    AR at 36.    The ALJ afforded some weight to the assessments in January 2014, while plaintiff was apparently sober, that indicate that plaintiff's condition was improving.   He assigned only some weight because, while the assessments were consistent with other records, they came just one month after plaintiff ceased using substances, and were during a short period of sobriety between periods of relapse.   AR at 36.   The ALJ also pointed to plaintiff's ability to obtain a job delivering pizzas as evidence that she was improving.   AR at 36.

The ALJ concluded that, without drugs, plaintiff's "mental impairment improves to the point where she is able to work with the restrictions set forth in the assigned residual functional capacity, notably limiting her to occasionally dealing with co-workers and the general public."    AR at 37.    The RFC that included substance abuse similarly limited plaintiff to occasionally dealing with co-workers and the general public, but also noted that plaintiff would be off-task 20 percent of the time.    The RFC that eliminated plaintiff's substance abuse was the exact same as the original, except it omitted the finding that plaintiff would be off-task.

With this RFC, the ALJ found that there were jobs in significant numbers in the national economy that plaintiff could

perform.    AR  at  37.  Ultimately,  the  ALJ  concluded  that
plaintiff's substance abuse was a contributing factor material
to the determination of disability, because plaintiff would not
be disabled if she stopped the substance abuse.  AR at 38.

## Standard of Review

The  scope  of  this  Court's  review  of  the  ALJ's  decision
denying  benefits  to  plaintiff  is  limited.    It  is  not  the
function of the Court to determine *de novo* whether plaintiff is
disabled.  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447
(2d  Cir.  2012).    Rather,  so  long  as  a  review  of  the
administrative  record  confirms  that  "there  is  substantial
evidence  supporting  the  Commissioner's  decision,"  and  "the
Commissioner   applied   the   correct   legal   standard,"   the
Commissioner's determination should not be disturbed.   Acierno
v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007).   "Substantial
evidence is more than a mere scintilla.  It means such relevant
evidence  as  a  reasonable  mind  might  accept  as  adequate  to
support a conclusion."   Brault, 683 F.3d at 447—48 (internal
citation  and  quotation  marks  omitted).     "Even  where  the
administrative  record  may  also  adequately  support  contrary
findings on particular issues, the ALJ's factual findings must
be  given  conclusive  effect  so  long  as  they  are  supported  by

substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotations omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a

32

reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."   Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

The Contract with America Advancement Act:   In 1996 the Social Security Act was amended by the Contract with America Advancement Act (hereinafter the CAAA), codified at 42 U.S.C. § 1382c (a)(3)(J).   The CAAA eliminated drug abuse and alcoholism as a basis for a finding of disability.   Instead, a person diagnosed with alcoholism or drug abuse must establish that she would be disabled under the Act without consideration of the effects of substance abuse.   See Cage v. Commissioner, 692 F.3d 118 (2d Cir. 2012) (The claimant bears the burden of proving that her drug or alcohol abuse is not a "contributing factor" material to a finding of disability).   Thus, when there is evidence of substance abuse, the disability determination does not end with the five-step sequential analysis.   Once an ALJ determines that a claimant is disabled and there is medical evidence of substance abuse, the ALJ must decide whether the substance abuse is "a contributing factor material" to the

determination that claimant is disabled.   20 C.F.R. § 404.1535.

Drug addiction or alcoholism ("DAA") would be material if the

claimant would still be found disabled if she stopped using

drugs.   20 C.F.R. §§ 404.1535(b)(1), 416.935(b).   "The

Commissioner's finding on DAA materiality may be based on the

record as a whole and does not require a medical opinion

specifically addressing this issue."   Avilas v. Colvin, No.

6:15-CV-6210(MAT), 2016 WL 873070, at *7 (W.D.N.Y. Mar. 8,

2016).   The CAAA in essence requires the ALJ to make two

assessments where DAA is involved.   If a claimant is found to be

disabled considering all of her impairments and limitations

pursuant to the five step sequential evaluation, the ALJ applies

the same sequential evaluation a second time to ascertain

whether the claimant would still be disabled if she was not

abusing drugs or alcohol.

    Application of the CAAA to Plaintiff:   The current appeal

pays tribute to the ALJ's finding that after considering all of

plaintiff's impairments, including evidence of substance abuse,

plaintiff was disabled, but if the plaintiff "stopped the

substance use" then she would be able to perform "light work" in

a competitive work environment.   AR at 32.   In other words, the

ALJ found that plaintiff would no longer be disabled if she

stopped "using substances."   AR at 32.   I find that this

conclusion is simply not supported by substantial evidence.

The key to the ALJ's determination as to disability was a finding that plaintiff's substance abuse was material to her disability because it would cause her to be "off task" from her job duties so much (20 percent of the workday) that she could not function in a competitive employment workplace. In applying the five step sequential analysis while including plaintiff's DAA, the ALJ determined that plaintiff would be limited to light work, occasional interaction with co-workers and the public, but would be off-task 20 percent of the time. However, if plaintiff stopped "using substances" the ALJ determined that she would be limited in exactly the same ways she would when abusing drugs except that she would no longer be off-task for 20 percent of the work-day. In making this finding, the ALJ distinguished plaintiff's physical impairments from her mental health impairments. The former, according to the ALJ, would be the same with or without substance abuse. The ALJ found, however, that plaintiff's mental health impairments would show significant and material improvement without substance use. AR 35.

It is clear that in finding plaintiff disabled when including her DAA in his analysis, the ALJ relied on the VE's testimony that someone who would be off task 20 percent of the workday would not be able to maintain competitive employment. AR 68-69. The ALJ's analysis narrowly frames the issue before

35

this Court: Putting all else aside, is there substantial evidence in this record to support the ALJ's finding that if plaintiff stopped using marijuana she would be on task enough during the work day to be capable of competitive full-time employment? After a thorough review of the record, I conclude that the record lacks substantial evidence to demonstrate that plaintiff's inability to stay on task is caused by her substance use. Indeed, the record supports a finding that it is not substance use but the myriad of other physical and mental health ailments plaintiff suffers from which limit her ability to stay sufficiently on task to be able to engage in competitive employment.

In making his findings of improvement, the ALJ relied on a period of sobriety between January and April 2014, and another in June 2014. However, as discussed below, the mental health evidence from these periods of sobriety does not demonstrate any improvement in her mental health, much less any improvement in her ability to be focused and on task.

January to April 2014: According to the ALJ, the January 23, 2014 report from Therapist Colangelo "shows the significant improvement in claimant's functioning just one month after she stopped using substances." AR at 36. This finding of "significant improvement" is difficult to reconcile with plaintiff's measured GAF rating of 50 in January 2014. "The

36

Global Assessment of Functioning ('GAF') Scale is a rating for reporting the clinician's judgment of the patient's overall level of functioning and carrying out activities of daily living. The GAF score is measured on a scale of 0-100, with a higher number associated with higher functioning." Montalvo v. Barnhart, 457 F. Supp. 2d 150, 160 (W.D.N.Y. 2006). "A GAF score of 50 indicates serious symptoms (e.g ., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g ., no friends, unable to keep a job, cannot work)." Wagner v. Colvin, No. 13-CV-00346A , 2016 WL 1593712, at *2 (W.D.N.Y. Mar. 22, 2016) (Foschio, J.), report and recommendation adopted, No. 1:13-CV-00346 (MAT), 2016 WL 1586373 (W.D.N.Y. Apr. 20, 2016); see Brueggemann v. Barnhard, 348 F.3d 689, 695 (8th Cir. 2003) (a GAF score of 50 "reflects serious limitations in the patient's ability to perform basic tasks of daily life").

While the ALJ correctly notes that GAF scores do not directly correlate with an ability to work, the scores can be "'particularly useful in tracking the clinical progress of individuals in global terms, using a single measure.'" Briscoe v. Astrue, 892 F. Supp. 2d 567, 570, n.2 (S.D.N.Y. 2012) (quoting Diagnostic and Statistical Manual of Mental Disorders ("DSM") 32 (4th ed., text revision 2000)). Here, plaintiff's

functioning was regularly assessed with GAF scores.  As noted by
the ALJ in his decision, plaintiff's GAF scores range from a
high of 60 measured in November 2010 to a low of 48 measured in
May  2013.  The  ALJ's  conclusion  that  plaintiff  exhibited
"significant  improvement"  in  functioning  by  January  2014  is
inconsistent  with  the  longitudinal  history  of  plaintiff's  GAF
scores.  Instead, plaintiff's GAF ratings support the conclusion
that plaintiff's drug use was not material to the existence or
severity of plaintiff's impairments in functioning.  In fact,
Therapist  Colangelo's  January  23,  2014  report  actually  finds
that plaintiff would be unable to function 10-25 percent of the
time  in  her  capacity  to  perform  simple  and  complex  tasks,
ability  to  maintain  attention,  and  capacity  to  regularly  attend
to a routine.  Far from showing substantial improvement in being
"off  task"  during  periods  of  sobriety,  the  January  2014
assessment  shows  the  opposite.  In  addition,  assessments  on
March 18, 2014, and April 21, 2014, all by Therapist Lupo, and
all during plaintiff's period of alleged sobriety, show that
plaintiff  continued  to  be  depressed,  anxious  and  struggling
during this time period.  AR at 490-514.

    June  2014:  The  ALJ  also  found  that  in  June  2014
"claimant's  mental  impairment[]  records  show  significant
improvement  without  the  substance  use."  AR  35.  The  ALJ's
findings in support of this conclusion are problematic.  The ALJ

accorded "significant weight" to the notes and records of Therpaist Lupo during this time period. The ALJ found notable that in a June 30, 2014 letter to plaintiff's attorney, Therapist Lupo commented that plaintiff had "made good progress" in substance abuse treatment, was "engaged in group and individual therapy appointments" and had "started to take responsibility for past actions." AR at 35. The correlation between being able to participate in periodic mental health therapy sessions and recovery skill groups and being able to engage in competitive full-time employment is not explained by the ALJ and is not obvious from this record. AR 35. That plaintiff is engaging in group therapy and is accepting responsibility for past behavior does not seem particularly relevant to the question of whether plaintiff would be employable in the absence of her DAA. Therapist Lupo's treatment records also confirm that during this same time period, Therapist Lupo found that plaintiff's mood and affect continued to be depressed (AR at 524) and Therapist Colangelo found plaintiff presented a moderate risk of self-harm and was depressed and anxious with negative ruminations. AR at 495.

The ALJ also found it important that plaintiff was able to return to work 5-10 hours a week delivering pizzas after she was "clean" from drugs. According to the ALJ, "[t]reatment notes confirm that claimant has shown significant improvement without

39

substance use, to the point where she was able to obtain a job working five-to-ten hours per week during the month after her reported clean date." AR at 36. (emphasis added). But the ALJ fails to mention that the plaintiff was specifically asked at the hearing about whether she obtained this employment and she unequivocally testified under oath that this entry in her therapist's notes was not correct. See AR at 59-60. Indeed, the ALJ pointedly asked plaintiff at the hearing whether the therapist's notes were "accurate" as to this part-time employment. Plaintiff responded "no." AR at 60. Plaintiff then explained to the ALJ that she had mentioned to her therapist that she "was going to try" to find some part-time employment "because I had been so stressed out on money" but had never been hired for any part-time job. AR at 59-60. Crediting a snippet from a disputed entry in treatment notes over the sworn testimony of the plaintiff is troublesome, particularly where the truth of an employment relationship would seem to be something that could be easily verified by simply contacting the identified employer.[6] "[I]t is the ALJ's duty to develop the record and resolve any known ambiguities, and that duty is enhanced when the disability in question is a psychiatric impairment." Camilo v. Comm'r of the Soc. Sec. Admin., No. 11

---

[6] A review of the record does not reveal any employment or wage records suggesting any part-time employment at or around the time such employment is mentioned in Therapist Lupo's notes.

CIV. 1345 DAB MHD, 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013).

In sum, the record shows that plaintiff is a young woman who for many years suffered from a variety of significant mental health issues, including PTSD, bipolar disorder, anxiety, depression, and a previous suicide attempt. The ALJ's determination that plaintiff's physical and mental health impairments would prevent her from engaging in competitive employment because, among other things, she lacks the ability to stay sufficiently "on task" to perform a job is certainly supported by substantial evidence. But a fair reading of the record does not support a finding that plaintiff's inability to focus and stay on task suddenly dissipated when she stopped using marijuana. To the contrary, the treatment records relied on by the ALJ appear to reflect a woman whose mental health symptoms persist at a level where competitive full-time employment is not realistic regardless of whether she is using or abstaining from marijuana. The ALJ's finding that plaintiff's mental health disorders would improve so dramatically that she would no longer be "off task" in a competitive work environment if she merely "stopped using substances" is not supported by substantial evidence in this record.

## Conclusion

The present record does not contain substantial evidence to support the ALJ's determination that substance is the material cause of plaintiff's inability to stay sufficiently "on task" to be able to engage in full-time competitive employment. Accordingly, plaintiff's motion (Docket # 9) is **granted** only insofar as this case is remanded to the Commissioner for further proceedings consistent with this Decision and Order. The defendant's motion for judgment on the pleadings (Docket # 13) is **denied**.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:  March 29, 2017
        Rochester, New York